Farmers State Bank v. Commissioner.
Farmers State Bank v. Commissioner
Docket No. 766.
United States Tax Court
1945 Tax Ct. Memo LEXIS 322; 4 T.C.M. (CCH) 94; T.C.M. (RIA) 45043; January 25, 1945
*322 Henry C. Moeller, C.P.A., 1124 Omaha Nat. Bank Bldg., Omaha, Nebr., for the petitioner. Gene W. Reardon, Esq., for the respondent. MELLOTT
Memorandum Opinion MELLOTT, Judge: The Commissioner determined deficiencies in petitioner's income and excess profits tax as follows: Excess
Year
Income Tax
Profits Tax
1940
$1,010.81
1941
1,273.88
$788.49
The proceeding was submitted upon a stipulation of facts and the facts are found to be as stipulated. The question is whether the assessment or collection of tax is prohibited by section 3798(b) I.R.C.[1]
*323 [The Facts] Summarizing the facts petitioner, a reorganized state bank of Nebraska, keeping its books on a cash basis and filing its returns with the collector of internal revenue in that state, had found, early in 1932, that its capital and surplus "were greatly impaired." The appropriate state department "furnished it with a schedule showing the procedural requirements for the reorganization of state banking institutions." Briefly they were that the old stockholders should vote an assessment on their stock in an amount sufficient to restore impairment of capital structure and make the bank solvent, and, after or contemporaneous with recapitalization, that depositors sign an agreement and waiver of withdrawal rights to the extent of 100% of all deposits. The creation of a "pool" in an amount sufficient to protect the reorganized bank against "all depositors who have not signed * * * and who may demand their deposits in full upon the reopening of the bank" was indicated to be an acceptable substitute for the last-mentioned requirement. On February 1, 1932, a 100 percent assessment was made against the stockholders ( $100 per share or $25,000) and the business of the bank was *324 suspended for purposes of reorganization. "Thereupon the old outstanding capital stock, par value $25,000, was cancelled and new capital stock, par value $25,000 was issued by the reorganized bank. Pursuant to an examination by certain committees under the approval of the State Banking Department, certain assets of the bank were charged off as worthless and others were partially charged off. The old surplus of $12,500 was eliminated and new surplus of $5,000 was contributed by the stockholders." "5. Further and additional money was needed to place petitioner bank in a sound and solvent condition, and accordingly, certain of the depositors of petitioner bank agreed * * * to pay from their deposits, or otherwise, for the purpose of forming a pool to comply with the request of the State Banking Department, the total amount of $115,335.47. In consideration therefor, the stockholders of petitioner desired to repay such depositors contributing to petitioner bank and pursuant thereto, on March 15, 1932, the stockholders entered into an agreement, a copy of which is attached hereto as Exhibit 3." The agreement referred to recited the substance of the facts shown above and stated: *325 * * * * *
"AND WHEREAS, although said money was contributed as an absolute donation, to the bank, yet it is the mutual desire of all of the stockholders of said bank to repay said persons so contributing to the bank. "IT IS, THEREFORE, AGREED by and between the undersigned stockholders of said bank in consideration of our mutual promises and agreements herein contained, that said stockholders shall not receive any dividends of any kind or nature upon their stock in said Farmers State Bank, at Sargent, Nebraska, until said sums of money are repaid to said depositors in full; and for the purpose of making effective this said agreement, the following assignment and order is hereby made a part hereof, to wit: "'We the undersigned stockholders, owning the entire capital stock of said Farmers State Bank, Sargent, Nebraska, do hereby sell, assign, transfer and set over, any and all dividends of any kind or nature, as they may be declared and paid by said bank, to the persons and depositors who have contributed to the pool aforesaid; and we do hereby direct said bank and its officers to pay said dividends as they may become due to each of said contributors ratably in proportion to *326 the amounts so contributed.' "This assignment and order upon the bank for said dividends is to be continuing and shall follow the stock of each of us in the hands of any transferee either by assignment, pledge, execution or other mesne processes. And to obviate misunderstanding or fraud, the officers of the Farmers State Bank, shall endorse on each and every outstanding stock certificate of said Farmers State Bank, a statement, as follows: 'Dividends payable by this bank are assigned and pledged in accordance with a specific contract original of which is on file with the Department of Trade and Commerce at Lincoln, Nebraska, and a true copy of same on file the Farmers State Bank, at Sargent, Nebraska.' "The foregoing agreement shall be binding upon heirs, executors, administrators and assignees forever. "IN WITNESS WHEREOF, we have and do set our hands this 15th day of March, 1932." Under date of September 1, 1932, it was mutually agreed between petitioner and substantially all of its depositors that withdrawals of deposits existing as of February 1, 1932, should be limited to one percent per month until the bank should be able to operate as a going concern without such restriction. *327 This agreement provided that no interest should be paid upon the deposits existing on February 1, 1932. "7. On September 3, 1932, the Department of Trade & Commerce, Lincoln, Nebraska, and George C. Whalen, Assistant to the Receiver in Charge of the Farmers State Bank of Sargent, Nebraska, turned over all the books and records, assets, business and properties of the old bank in reorganization to the offices of the reorganized bank, and the Farmers State Bank of Sargent, Nebraska, was reopened and business was resumed. The original charter granted by the State of Nebraska to the Farmers State Bank, Sargent, Nebraska, has never been cancelled and the reorganized bank has continued to operate thereunder. "8. The following is a statement of the petitioner bank on September 3, 1932, after reorganization and when it resumed business: Assets
Loans and discounts (face value
$207,445.72 written down to)
$ 91,044.69
Bonds and securities
5,400.00
Cash
3,218.94
Balances with banks (totals)
7,457.11
Balance with Receivership Division,
Dept. of Banking
30,453.47
Banking House
2,500.00
Furniture and fixtures
800.00
Special deposit to cover deposits of
parties refusing to waive with-
drawal rights
3,709.61
Total assets
144,583.82
Liabilities
Capital stock
$ 25,000.00
Paid-in surplus
5,000.00
Undivided profits
745.66
Drafts outstanding
8,569.15
Certified checks
1,125.00
Frozen deposits - to be paid at the
rate of 1% per month
58,800.86
Released deposits
32,162.49
Contingent reserve for Depositors
Final Settlement Fund
9,471.05
Special deposit - Security State Bank,
Broken Bow (reserve set up for
non-waivers)
3,709.61
Total liability and capital
$144,583.82
*328 "9. Under the reorganization, loans and discounts of the old bank were written down in the amount of $116,411.03, and real estate of $19,860.00 was completely charged off. The aforementioned sum of $115,335.47, referred to in paragraph 5 above, which was waived by certain depositors and eliminated as a liability of the reorganized bank, was reduced to $11,530.95 by January 2, 1942, through voluntary payments from collections made from the above said assets written down and charged off and by the application of the bank's earnings as follows: "Amounts of deposits waived at the time of reorganization
$115,335.47
Payments from
Assets Charged
Payments from
Off and
Bank's Earnings
Written Down
August 23, 1935
$ 2,904.17
$ 8,631.68
May 1, 1936
5,073.96
6,457.89
January 8, 1937
6,338.54
5,195.31
August 30, 1937
4,192.40
7,341.45
August 8, 1938
4,221.93
7,311.92
June 30, 1939
9,053.01
2,480.84
July 9, 1940
6,657.13
4,876.72
January 14, 1941
8,166.59
3,367.23
January 2, 1942
8,854.24
2,679.51
Totals
$55,461.97
$48,342.55
$103,804.52
Balance January 2, 1942
$ 11,530.95
"10. The petitioner has never formally *329 declared a dividend since its reorganization in 1932, and the payments of earnings and collections from assets charged off and written down under the said reorganization were made to the said waiving and contributing depositors pursuant to the agreement of stockholders of Farmers State Bank, Sargent, Nebraska (Exhibit 3)." In its return for 1940 petitioner deducted - listing the amount on Line 17 "Rent" followed by the notation "Paid to Depositors Trust Fund" - $7,591.57. On the same line petitioner listed in its 1941 return $7,658.24, which it admits is the same type of payment. The claimed deductions were denied. The disallowance of the claimed deductions is not charged as error; but petitioner contends it is immune from the payment of any tax by section 3798 (b), supra. The instant case cannot be distinguished upon its facts from Peoples Bank, 43 B.T.A. 589. Here, as there, by express agreement, the release given by the depositors was unconditional. The money was contributed "as an absolute donation." The provision of the contract looking to reimbursement before the stockholders claimed any dividends was not binding on the petitioner. The contributing depositors *330 neither asked nor were they given "a lien upon subsequent earnings of the bank." Their claims for reimbursement were against the stockholders who signed the contract and not "against assets segregated by such bank." The bank, as such, made no contract, granted no lien upon its earnings and segregated none of its assets. As we stated in Peoples Bank, supra, "the contracting parties, the stockholders, are without power to bind the bank's future earnings, which become petitioner's property as they arise and remain so until the declaration of dividends." Upon brief petitioner says: Ever since 1932 earnings of the bank have been credited to The Depositors' Trust Fund, and the fact that every year since 1932, the Stockholders Agreement, on file with the State Banking Department, has been lived up to by the bank constitutes sufficient evidence that the bank is the real party granting the lien on subsequent earnings to its waiving depositors. It is an undisputed fact that regardless of the imperfections in drawing up the necessary instrument, the taxpayer has continuously, since 1932, applied its earnings on depositors' claims, and it constitutes the very best evidence of *331 what was intended to be done in the beginning. This, it contends, shows that there was an equitable lien. We do not agree. No extended discussion of equitable liens is required. Such a lien, it has been said, may arise * * * from a written contract which shows an intention to charge some particular property with a debt or obligation, or is implied and declared by a court of equity out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings. 10 R.C.L. 351. The written contract here shows no intention to charge some particular property of the bank. The purpose of the agreement was exactly the opposite. Nor has there been any fraud, duress, undue influence, overreaching, or unconscionable dealing by a fiduciary or any other circumstance requiring the intervention of a court of equity. Even if it be assumed that petitioner felt it was morally obligated to reimburse the depositors, no equitable lien existed; for such a lien cannot be based purely upon a moral obligation. Stansell v. Roach, 147 Tenn. 183, 246 S.W. 520. It is fundamental that a taxpayer seeking immunity from tax must bring itself *332 strictly within the terms of the provisions of the statute granting it. Retailers Credit Association of Alameda County v. Commissioner, 90 Fed. (2d) 47; Producers Creamery Co. v. United States, 55 Fed. (2d) 104; Participation Holding Co., 1 T.C. 852. Petitioner, in our judgment, has not sustained this burden. One other circumstance may be adverted to which tends to support the conclusion we have reached. The parties have stipulated that some of the reduction occurred "through voluntary payments from collections made from * * * assets written down and charged off * * *." The fact that the payments were voluntarily made is at least a circumstance indicating that no legal obligation to make them existed. We are of the opinion and accordingly hold that the Commissioner committed no error in determining the deficiencies in tax. Decision will be entered for the respondent. Footnotes
1. SEC. 3798. EXEMPTION OF INSOLVENT BANKS FROM TAX. * * * * *
(b) Whenever any bank or trust company, a substantial portion of the business of which consists of receiving deposits and making loans and discounts, has been released or discharged from its liability to its depositors for any part of their claims against it, and such depositors have accepted, in lieu thereof, a lien upon subsequent earnings of such bank or trust company, or claims against assets segregated by such bank or trust company or against assets transferred from it to an individual or corporate trustee or agent, no tax shall be assessed or collected, or paid into the Treasury of the United States on account of such bank, or trust company, such individual or corporate trustee or such agent, which shall diminish the assets thereof which are available for the payment of such depositor claims and which are necessary for the full payment thereof.↩